## MANNING *v.* THE STATE.

1. Evidence showing the participation of the defendant in homicides other than that for which he is being tried is admissible to show a motive, or scheme to commit such crime.

2. Where a defendant admits the perpetration of a homicide, but, in connection with such admission, gives an explanation justifying or excusing his commission of the offense, it is error for the trial judge to refuse a timely written request to charge that such admission, with such explanation, would not create a presumption that the accused was actuated by malice.

3. A new trial being granted, this court expresses no opinion upon the evidence.

> No. 2800. APRIL 11, 1922.

Indictment for murder. Before Judge Hutcheson. Newton superior court. July 30, 1921.

At the March term, 1921, of Newton superior court, John S. Williams and Clyde Manning were jointly indicted for the murder of Lindsey Peterson. The homicide was alleged to have been committed " by tying a chain about the neck of said Lindsey Peterson and weighting the body with a certain sack full of rocks and drowning the said Lindsey Peterson in Yellow River." Williams was tried and convicted; and the judgment was affirmed by this

court. *Williams* v. *State,* 152 *Ga.* 498 (110 S. E. 286). Subsequently Manning was tried and convicted. He made a motion for new trial, which was overruled, and he brings his case to this court assigning error on this judgment. The evidence introduced on his trial was substantially as follows: Carl Wheeler testified: I lived near Allen's bridge, in Newton county, Georgia; was there the morning they found those people; don't know who they were. They were men, two of them black men. Mr. Cassells' boy went and found them. They were in the water. No part of the body was exposed except a shoe sticking up out of the water, with a foot in it. I and another fellow pulled them out. They were dead. That was in Newton county. Don't remember when it was. It was in the spring of this year, if I am not mistaken. These men were fastened together around the neck. Saw nothing but the trace-chains. A sack with rocks in it was tied to them. The sack was tied to those negroes, and the rocks were tied to them with a rope. Don't think it was tied to the chain. We pulled them out on this side of Yellow river at Allen's bridge. Was there when Sheriff Johnson came.

Dr. C. D. Hardeman testified, that he lived two and a half miles this side of Allen's bridge. Remembered the occasion when some bodies were found down there, on March 13, 1921. Went down there about the time the sheriff got there. When he got there the bodies were on this side of the river, on the bank. They were chained together with a trace-chain around their necks, tied with wire, and a sack of rocks tied to the chain. The hands were tied. One negro's hands were tied. Another had one hand loose. Three hands were tied together. In his opinion these men were put in the water alive. He has mighty little ground on which to base that opinion. He bases it upon the conditions of the neck, of the tongue, and the general conditions. At Allen's bridge the water, he guesses, was something like ten feet deep in the main run of the stream, and three or four feet deep at the edges. The point where they discovered the bodies was pointed out to him. It was not in the main run of the river, but a little this side of the main run. The water was deep enough to drown them.

B. L. Johnson, sheriff of Newton county, testified that he remembered the occasion when some bodies were found drowned at Allen's bridge. It was in March of this year, between the 12th and

15th. Found two dead bodies, black men. They had on overalls and were fully dressed. The bodies were tied together with a trace-chain around their necks. There was a sack of rocks tied to the trace-chain in the way of a sinker, attached to the chain between their necks. They were tied pretty close together. The sacks of rocks was tied with a wire rope, and the rope tied to the chain. The sack of rocks would probably weigh seventy-five or a hundred pounds. At that place the water is pretty deep. Tied in that condition it would be easy to drown them there in the water. Their hands were tied together with wire. One of them had one hand tied and one loose. That place is in Newton county. At the coroner's inquest Clyde Manning identified these bodies as those of Willie Preston and Lindsey Peterson. Manning made a statement in reference to those bodies, as to the death of those men, and how they came there. No one offered him any inducement to make these statements. Didn't threaten him in any way. Nothing was said to him by which he could have apprehended any trouble to himself in any manner, before he made such statement. No offer of reward or hope of benefit was held out. He said he, Mr. Williams and Charlie Chisholm brought them there, and threw them off the bridge alive into the water. He told me that Mr. John S. Williams and Charlie Chisholm was with him, that they came there in an automobile on Saturday. It seems it was about ten days or two weeks before we discovered the bodies. Clyde told us about other bodies, and we wanted to see whether or not he told us the truth. We went to search for the other bodies, and found them as he told us. Some were buried, and some drowned. Some were buried on Mr. Williams's place. He told us the names of those who were buried. Three, Johnnie Williams, Johnnie Green, and Will Givens, were buried in the pasture of Mr. John S. Williams. Fletcher Smith, he thinks, was the one in the corn-field. Manning pointed out the places where these three were buried. We found the graves, and in the graves found the bodies. We found Fletcher Smith in the corn-field. Corn had been planted where he was buried, and some had come up right over the body. They had plowed over the body.

From there we went to a corn-field on another one of Mr. Williams's places, and he pointed out another one. He was buried in a sort of new ground. They called this one Big John. He was

buried right at a vacant house. Manning pointed that place out.
We went and found some more bodies in the water where he told
us they were in the river. One was Charlie Chisholm at Waters
bridge on the Alcovy river. The water in that river is from ten
to thirty feet deep. Was not there when that body was pulled out, .
but saw it. It was tied with a chain, and my recollection is there
was a sack of rocks tied to the negro around his neck. The sack
of rocks would weigh something like seventy-five pounds. We dis-
covered some other bodies the next day, Sunday. Found them in
Alcovy river, at the same place we found Chisholm's body. Those
bodies were chained together. The chain was around their necks.
Was not there when the bodies were first found. A big piece of
iron was attached to the chain for a weight.

No threats, inducements, or promises of reward or benefit were
held out to Clyde Manning, nothing done in any way to get him
to show us those bodies or identify them. He told us if we would
take him he would show us. It was all voluntary, and of his own
will, without any inducement or reward or hope of reward. No
officer made any threats, and we offered him no inducement what-
ever. Found the body in South river at Mann's bridge about
March 15th. That was directly after the discovery of the bodies
at Allen's bridge. It was tied around the neck with a chain and
a sack of rocks attached to the chain. The sack of rocks would
weigh something like seventy-five pounds. The water was of
sufficient depth there to drown a man tied around the neck with
a chain and a sack of rocks tied to it. That was two or three days
after the bodies were found at Allen's bridge. Clyde told us who
it was. He said it was a negro by the name of " Foots." His
other name was Harry Price. Clyde said he was thrown in the
same night, that Preston and Peterson were thrown in at Allen's
bridge. He said after they had thrown those two over at Allen's
bridge they carried this one over to the other river and put him in
there. They went in Williams's automobile, and Williams drove.
It was near a mile from Allen's bridge to Mann's bridge. Allen's
bridge, it seemed to him, would be ten or twelve miles from Will-
iams's house, and Mann's bridge would be about a mile further.
Manning's home, where he lived, was 150 yards from Williams's
house. From Williams's house you can see the pasture, which is
some 200 yards from Manning's house, and probably 300 or 350

yards from Williams's house. The pasture is in front of Williams's house to the side and back of it, and back of Clyde's house. The body of Fletcher Smith was found on the hillside in the corn-field. I was told that that was John S. Williams's land. Clyde Manning told us that Fletcher Smith was killed by John S. Williams, who shot him with a shotgun in the head. There was a wound in Fletcher Smith's head. Clyde didn't say he helped Williams kill Fletcher, but he helped bury him. Manning said that Charlie Chisholm killed Big John. He said he helped dig the hole to bury Big John, and helped throw the dirt on him after Chisholm killed him. He said he killed William Givens and Johnnie Green, but his understanding was that Charlie Chisholm killed Johnnie Williams. He said John S. Williams was with them when they killed him. They killed them by hitting them with an axe. We found Little Bit, John Brown, and Charlie Chisholm at Waters bridge, something like seven or eight miles from Williams's place, near the county line bridge. Have been told that Newton County owns two thirds of this bridge and Jasper County one third. Mann's bridge is a county-line bridge, and I understand half and half belongs to each county. Clyde showed us where " Foots " or Harry Price jumped off. He said it was on the upper side of the bridge; and that would be in Newton county.

On cross-examination the sheriff testified as follows: I first saw Clyde Manning during the March term of our court. The grand jury had him subpœnaed in a case about the bodies that were found down about the river, and those of Lindsey Peterson, Will Preston, and Harry Price. Mr. Wismer and Mr. Chastain were present at two conversations with Clyde Manning when he was present. In those conversations Manning told us about these various details that I have testified about. He stated that John S. Williams was present on each occasion when the deaths occured. He stated that he participated in each of those deaths in the manner I have described, because he said he was afraid not to do it. He was afraid Mr. Williams would kill him. That was a part of the conversations in which he made the admissions about which he had testified. He said he was willing to tell all about it. He told us the complete story, and his statement has been substantially the same ever since then. No one, no attorney or adviser, had seen Manning at that time, that I knew anything about. He always

stated that he did it at the command of Mr. John S. Williams, and because he was afraid not to do it; he was afraid Mr. Williams would kill him. In those statements he said he did it through fear of death, if he did not obey the command of Mr. Williams.

A. J. Wismer testified: I am special agent of the Department of Justice of the United States. Had occasion in the course of my duties to the government to go to the farm of John S. Williams. That was on February 19, this year. Went to Mr. Williams's house to conduct an investigation for the government. Mr. Brown was with me. Went to Mr. John S. Williams's farm to make an investigation as to alleged peonage conditions on his plantation. When we got there, Williams was not at home. We saw Clyde Manning, John Brown, and Johnnie Williams. We talked to Clyde Manning. Asked Clyde Manning whether he acted as guard over the hands on the place and locked them up at night, as had been reported to us, and asked whether he had gone and helped catch one Gus Chapman and return him to the place. He denied all about it to us. Don't recollect having talked to a man by the name of Lindsey Peterson on that occasion. Brown talked to some of the negroes that I didn't see. I didn't take the names of those from whom I got no information. I talked to John Brown and Johnnie Williams, at John S. Williams's house before he came. Talked to some of them together, then separately. We had practically finished talking to them when Williams returned, and we began talking to him. Williams drove up and introduced himself. I told him my business, and told him I had been talking to those boys there, and had asked them about Gus Williams, and his having run away from his place, and he said, yes, he had; and he said that he and Clyde, and I forget the name of the other negro that went, went and caught him, brought him back, and when he made that statement Brown turned around to Clyde and said, " You just told me a lie, didn't you." I don't believe Clyde answered one way or the other. We then got in Mr. Williams's car and went back with him over to his other place. Clyde was not with us. We talked to some other negroes and to Mr. Williams's three sons. Don't recollect all the negroes we talked to, but we talked to Clyde Freeman. We talked to Williams about the killing of the negro, Blackstrap. I have since found out that his name was Nathaniel Wade. I am not sure that Clyde Manning was present, but Mr.

Williams denied that there had ever been such killing there on his place. I asked him if any one else had been killed on the place, and he said there had been a negro killed on the place by the name of Will Napier, by his son, Hulan, in self-defense. Mentioned to Mr. Williams other negroes, but he said that was the only killing that had ever taken place on his place. We talked to Clyde Manning about Blackstrap being killed, and he denied all about it. The only information I got while I was on the place that day, which had any bearing on the situation, was from Johnnie Williams. He was the only negro on the place that told me anything. I have seen Johnny Williams since I was there. Saw him over in the pasture, and he was dead. He had been buried at the edge of the creek. It was approximately three weeks after I saw him and talked to him until I saw him there dead. Clyde Manning pointed out the place where Johnnie Williams was buried.

Cross-examination: Have been present here each time that Clyde Manning has made admissions to the officers, as far as I know. The first time I heard his story was the time Sheriff Johnson referred to. I was present. Never talked to him outside of the presence of these officers. Can not give the exact date of that conversation, but it was when the March grand jury was in session. At that time Clyde admitted his partipation in those acts. He stated that after we had been down there conducting that investigation Mr. Williams had said to him, " Clyde, we have got to do away with these negroes, or they are going up to Atlanta and break me and my boys' necks." Clyde stated that he told him he " hated to do anything like that." Mr. Williams told him, " Well, it is just your neck or theirs, whichever you think the most of." Everytime he made those statements with respect to each one of those particular killings, it was always accompanied with the statement that he acted through fear of death at the hands of Mr. Williams.

The evidence of Clyde Manning, as a witness for the State, on the trial of John S. Williams, was read to the jury. This evidence is set out substantially in the report of the case of *Williams* v. *State,* 152 *Ga.* 498 (110 S. E. 286), and need not be repeated here.

Clyde Freeman testified for the defendant, substantially as follows: Had been living with Mr. John S. Williams, going on thirteen years. Remembers when the officers came down to the

farm. Saw Mr. Wismer there. He didn't talk to me, but the other fellow with him did. Didn't tell them anything. Was afraid to tell them anything. I was afraid of Mr. John Williams and his boys. Knew Peterson, Preston, and Price. Know when they left the place. John S. Williams came to the place that Saturday evening and told them he would take them to the train that night or Sunday morning, but don't know when he told them. Saw Peterson and Preston after they were dead. Never saw them any more after they left the place that Saturday afternoon. Williams came up there about dinner time and asked them if they wanted to go back home, and they all told them they wanted to go. Knew Blackstrap. He and " Little Bit " ran off one day. They caught " Little Bit," and looked for Blackstrap two or three days before they found him. They brought him back. Never heard any of them say what became of them. Knew " Iron Jaw." Mr. Leroy Williams killed him. We were over there by the little neck of the pond from the house when he shot him. They whipped him first. He had been running up some wire by the pasture, and Mr. Leroy told Charlie he was not having it done right, and he got a stick and hit ' Iron Jaw " and told him he would kill him. " Iron Jaw " told him " Well, kill me," and he just says, " I will do it," and he pulled his pistol and killed him. He shot him in the arm the first time, and shot him in the body the next time. After he shot him he told me to pull his clothes off. They then took " Iron Jaw " down to the river, down to the pond, and throwed him out there in the pond. Marvin Williams asked witness what the United States officers' said to him, and he told him what they had asked him, and he said he had never told them anything. He then described the whippings of the employees by Williams and his sons. He had never seen anybody else killed on the place, except those named, but saw Will Napier after he was killed.

Gus Chapman, for the defendant, testified that he worked on the Williams farm. He was locked up in the Atlanta station house. Hulan Williams came up there and said to him, " Go down and work for me. It will be the same as your home." And he went down and worked for him. This was in April, 1920. When he got down there they locked him up. He ran away last July. He had gotten down before Shady dale, when he was overtaken by Mr. Williams and taken back. Williams took him into a wagon shelter,

and made him pull down his clothes, and said he would kill him. He was whipped with a buggy trace. Williams said he would let him go this time, but if he ever ran away again he would kill him. On Thursday after Thanksgiving he ran away again and had never been back. Knows about the killing of Blackstrap. Blackstrap had run away. He had been gone about a week, and was hired by a man down there who sent word that he had three negroes and to come down. He went down Sunday and got him and brought him back. They had him down over a barrel, whipping him, and he was begging them. He said kill me; and Hulan gave Charlie Chisholm his gun and told him to shoot him, and Chisholm shot him through the head.

Frank Dozier, for the defendant, testified: that he had worked on John S. Williams's farm, worked for his son Leroy, and stayed in a little shack at night, locked up. He came from Macon. Was arrested in Macon for sitting down at the depot, and for vagrancy. Was fined $20.75, and Hulan Williams paid that. When he paid his fine he brought him on home that night. Marvin Williams hit him on the head three times with a stick, and left some scars. He got more whippings after that. They whipped him for just most anything. Knows about "Iron Jaw" being killed. Didn't see the shooting. He and Fletcher were cleaning up the engine, and heard a pistol fire three times. Leroy came to them and said he didn't want to hear anything about that. Clyde Manning knew about this, and he knew about the killing of Iron Jaw.

James Strickland, for the defendant, testified that he worked on the Williams place; got there by being in the stockade. Hulan Williams got him out. They locked him up at nighttime. Was there when Long John ran away. The caught him and brought him back and whipped him. Marvin, Leroy, and Hulan Williams and Clyde Manning and June Manning all whipped him. One night they beat Long John up. Clyde Freeman got some wire to build a hog pasture. Freeman and Long John went to get the wire. Long John was not able to tote it, and Freeman wanted to whip him, and he asked Leroy to stop whipping him and kill him. Leroy Williams asked if he wanted him to kill him sure enough, and he told him yes, and he shot him in the arm. Williams then asked him again if he wanted him to kill him. He nodded his head, and Williams then shot him in the side of the head. Will-

iams told me and " Foots " to take the clothes off of him. I pulled off his shirt, and " Foots " took off his overalls.

Emma Freeman testified for the defendant: Lived with Hu'an Williams the first of the year, this year. Have been living there seven years. Remember John Singleton when he was on the Will-iams farm. He got killed, but I don't know how he got killed. He came to the house for dinner, ate dinner, and went back there to plow corn, and I never saw him any more. Saw his body the next week for the first time down there in the river, in the pond, we call it. What caused the discovery of the body when it came up, the buzzards were flying around there so thick, and they found it was the body of John Singleton. They said Charlie Chisholm and Leroy Williams killed him. Marvin Williams saw him kill him, and Charlie Chisholm said he helped kill him, and then Marvin Williams said he killed him. Saw the body of Blackstrap after he was killed. Went down to the river and saw him lying in the river, when he had come to the top of the water. He had been sunk and come up again. Have seen men on the place whipped. Saw them whip Bill Givens and Peter. Saw them whip Big John. Have seen a heap of whippings. Saw Lula Benton after she was hit. She was as bloody as she could be. John S. Williams hit her. Clyde Manning was not there all the time I have been telling about, but he was there when Lula got hit. He saw all the whippings down at Mr. Johnnie's.

Claude Freeman testified for the defendant: He had been living with Hulan Williams going on three years. Had been on the Williams farm for twelve years. Employees on Williams's place were from the stockade. They have had as high as eighteen at a time. The employees were put in a house every night, and fastened up. There were bunks up by the side of the wall for the men to sleep in. Some slept in the bunks and some on the floor. I was on the place when John Singleton was killed. He was killed the last of July or the first of August, 1918. That night Luke Williams, the little boy of John S. Williams, asked Marvin Williams about John Singleton, and Marvin Williams told him, " hush, he ran away." When Clyde Freeman and Clyde Manning came up and asked where Singleton was, Marvin Williams told us that he had better not hear any word about John Singleton; if he did he would know where it came from. After that, saw the body of

13

John Singleton down in the pond. That was eight or ten days after he was killed. Was down there, and buzzards were flying around so thick that Marvin Williams sent to the house to get some ropes and some wire, and they went down there and he tied it around his neck, got the boat, and this witness and he got a big rock, put it in the boat, dragged his body out in the water where it was deep, tied the rope to the rock, tied it to his body, and the body sank. Saw Will Napier after he was shot before he died. He was killed the first of the year by Hulan Williams. That was in 1919. Knew when "Iron Jaw" was killed. His body is in that lake down there, called the pond. We picked up Will Napier's body, carried it to the house, and put it in the bed. He was alive then. He died that night. Hulan Williams said he shot him. Knew when Long John was killed. Leroy Williams whispered to Harry Price, that is, "Foots," tell the boys he did it, and when he went away Harry Price told the boys Leroy Williams killed him. Negroes on the place didn't talk about these things. They wouldn't talk about it. They were all scared to say anything about it. Whenever Hulan Williams told them to do anything they would do it. He would threaten to shoot them, kill them or whip them. Remembers when Blackstrap was killed. He and "Little Bit" ran away. They caught "Little Bit," brought him back. A day or two after they caught "Little Bit" they caught Blackstrap and brought him back. They kept bloodhounds on the Williams place. They used these hounds to catch people who ran away. Clyde Manning knew the bloodhounds were there. He shot at hands by the direction of Mr. Williams and his sons.

The defendant Manning made this statement. He described in detail the killing of various employees on the Williams farm. He gave the same account of the killings mentioned by Sheriff Johnson. He stated that his participation in these homicides was due to the fear of the defendant Williams; that he was afraid he would be killed if he disobeyed the commands of Williams in these matters. In reference to the killing of Will Preston, Lindsey Peterson, and Harry Price, he stated that the defendant Williams told him, "I am going to do away with them boys to-night." He further stated that Williams said to him, "It ain't going to do to let these boys go off from here." Williams told him and Charlie Chisholm to tie them. He didn't want to do it. He didn't want to

hurt them. He had to do it to save his own life. He didn't leave Williams after these killings started, because Williams had a bloodhound.

*Underwood & Pomeroy* and *A. D. Meador,* for plaintiff in error.

*George M. Napier, attorney-general, A. M. Brand, solicitor-general,* and *Seward M. Smith, asst. atty.-gen.,* contra.

HINES, J. (After stating the foregoing facts.)

1. The first twelve grounds of the amendment to the motion for new trial deal with the admission, over the objection of the defendant, of evidence of the commission of other homicides by the defendant. The objections to the admission of this evidence were (*a*) that such evidence was irrelevant, immaterial, and inadmissible, and (*b*) because there was no general scheme or plan shown by the State, under which these other homicides and the one for which the defendant was tried were committed, and this evidence was not so connected up as to show that there was any plan or scheme of which the one charged in the indictment formed a part. In reviewing the case of Williams, who was jointly indicted with this defendant for this homicide, this court, in dealing with similar, if not the same, evidence, said: "The evidence tending to connect the accused with the homicides other than that for which he was indicted was admissible as tending to show a motive, plan, or scheme to commit the crime for which he was on trial." *Williams* v. *State,* 152 *Ga.* 498 (110 S. E. 286). The defendant admits his participation in these other crimes, but asserts that he committed them, and the one for which he was tried, under such threats and menaces of his codefendant, Williams, as to render him guiltless. This evidence of the commission of these other crimes was as much admissible against him as against his codefendant, as the jury might find, from the evidence in the case, that he had a motive for getting rid of the other negroes who were killed. He might become involved in the peonage charge with Williams. After he participated in the first homicide, he might have the further motive of getting rid of others who had knowledge of such homicide, and might become witnesses against him in regard thereto. Anyway, we think this question is decided against this defendant under the ruling in the Williams case, which we see no reason to change.

2. The court was requested in writing by counsel for the de-

fendant to charge the jury as follows: " I charge you that murder does not consist merely in the killing o'f a human being; the killing must be done with malice. When the fact of the killing is shown, and the evidence adduced to establish the killing shows neither circumstances of justification nor alleviation, malice may be inferred. Likewise, if the statement of the defendant admits the homicide without explanation, malice may be inferred from such admission. But if at the time of the admission the homicide is justified, such qualification of the admission of the homicide robs it of the vital element of murder, and the burden would still be on the State to show that the killing was done with malice." The court erred in refusing to give in charge to the jury the principle of law embraced in this request. The State relied for conviction, in part, upon statements of the defendant and upon his testimony given as a witness for the State, when his codefendant, Williams, was tried under this indictment. Without such statements and testimony the State might not be able to connect the defendant with the crime charged. In each of these statements of the defendant and in his testimony on the trial of Williams he stated that his participation in this offense was due to threats or menaces made by Williams, which were sufficient to show that his life or member was in danger, or that he had reasonable cause to believe, and did actually believe, that his life or member was in danger. If this were true, he would have been justified in his participation in the offense. His admission of participation in this crime was accompanied by this explanation,. which, if true, would negative malice. He was therefore entitled to an instruction which presented this matter clearly and fully to the jury. This would have been done if the court had given the principle embraced in this request.

That part of his statement and testimony, which, if unexplained, would criminate, although it could be received as evidence of the fact admitted, could not, to the exclusion of another part which qualified and explained it, create a presumption that the accused was actuated by malice and was guilty of murder. *Fulch* v. *State,* 90 *Ga.* 472 480 (16 S. E. 102) ; *Green* v. *State,* 124 *Ga.* 343 (52 S. E. 431) ; *Mann* v. *State,* 124 *Ga.* 760, 763 (53 S. E. 324, 4 L. R. A. (N. S.) 934)..

Did the refusal of the court to give this instruction, which embraced a correct and pertinent principle, constitute such harmful

error as requires the grant of a new trial? Was it a harmless error, or did it, in the absence of such instruction, tend to do harm to the defendant? If harmful, was it cured by other instructions which the court gave to the jury? The court gave in charge to the jury section 41 of the Penal Code, which bears on the subject of the commission of a crime under threats or menaces which sufficiently show that the life or member of the defendant was in danger, or that he had reasonable cause to believe, and did actually believe, that his life or member was in danger, and which provides that, under such circumstances, the defendant shall not be found guilty. The court then charged the jury as follows: " Gentlemen, the defendant has admitted he did certain things in conjunction with the codefendant in the bill of indictment, John S. Williams, but he says he acted under threats and menaces and under coercion; and in determining this question you can look to all the facts and circumstances of the case, and if it appears to you that the defendant, Clyde Manning, was forced by coercion to take the part that he did, provided you believe that he did in fact take a part, and that the coercion was of such a nature as to excite in the mind of the defendant, Clyde Manning, a reasonable fear that his life or member was in danger, and the facts and circumstances were such as to cause you to believe that the defendant now on trial did whatever the evidence and the statement of the defendant show that he did do, and that he did those things by reason of threats or menaces, as I have heretofore charged you, then he would not be guilty of any crime, and it would be your duty to acquit him." Did these instructions cure the error committed by the refusal of the court to give the above instruction requested by the defendant? Can this court say that the defendant was not hurt by the refusal of the court to give the pertinent legal principle embraced in this request preferred by him? The instructions of the court upon the subject of the commission of a crime under threats and menaces fully presented to the jury the defense urged by the defendant. But would this dispense with a pertinent, proper, and correct instruction upon the subject of malice, which is the gist of murder? Was not the defendant entitled to an instruction that " murder does not consist merely in the killing of a human being; the killing must be done with malice "? Was he not entitled to an instruction that if he made a statement admitting the homicide, but at the time of

making such statement he excused the killing, such qualification would negative the vital element of murder and place upon the State the burden of showing malice?

The State relied, in part certainly, for the conviction of the defendant, upon his previous statements and testimony, the latter being given on the trial of his codefendant for the same homicide, in all of which, while admitting the homicide, and the atrocity attending the same, he stated that he engaged in the commission of this atrocious crime under threats or menaces on the part of his codefendant, which, the jury may find, sufficiently show that his life was in danger, and that he had a reasonable cause to believe, and did actually believe that his life was in danger. To convict the defendant, the jury would have to accept his inculpating admission and entirely reject his exculpating explanation of his participation in the killing. Under such circumstances, the defendant was entitled to have the court give in charge to the jury every correct, pertinent principle of law bearing upon the question of malice. This is especially true when the court instructed the jury that " malice shall be implied where no considerable provocation appears, and where all the circumstances of the killing show an abandoned and malignant heart." The defendant was entitled to an instruction that, although no considerable provocation appeared for the homicide, and although the circumstances of the killing showed an abandoned and malignant heart, the jury should not presume malice from the proof of the above statements and testimony of the defendant. So we can not say that the error of the court in refusing the above request was cured by his other instructions to the jury.

3. The fourteenth and fifteenth grounds of the amendment to the motion for a new trial can be considered together. In the fourteenth ground the defendant complains that the court erred in charging the jury as follows: " As to whether or not such evidence does show a motive or a scheme upon the part of the defendant, or whether or not such evidence tends in any way to connect the defendant with the offense charged in this indictment, are exclusively questions for you to determine and upon which the court intimates or expresses no opinion." In the fifteenth ground the defendant complains of the following charge: " The court has admitted to you testimony relied upon by the State to show

that the defendant, Clyde Manning, has committed other crimes and other homicides than that set out in the bill of indictment. I charge you that evidence of these other crimes have been submitted to you, not for the purpose of showing or establishing the fact that the defendant Manning is guilty of these other crimes, but solely for the purpose, which you may consider, in showing whether or not a motive or scheme existed on the part of the defendant, and in what way connect the defendant with the commission of the crime alleged in this indictment; and it is for this purpose only that I have permitted this evidence to go before you. As to whether or not such evidence does show a motive or scheme upon the part of the defendant, or whether or not such evidence tends in any way to connect the defendant with the offense charged in this indictment, are exclusively questions for you to determine. and upon which the court intimates or expresses no opinion." The errors assigned on these charges are (1) that under them the jury could consider evidence of other crimes as tending to prove the guilt of the defendant of the crime charged; (2) because they were misleading, as thereunder the jury could consider the commission of other crimes as proving or tending to prove the commission by the defendant of the crime for which he was tried; and (3) because such charges do not limit the use of such evidence to the establishment of a general plan, scheme, or motive, but permit the jury to consider the evidence referred to as tending to prove the defendant's guilt of the crime for which he was being tried, independently of a general plan or scheme. It is complained that under these charges the jury could consider the defendant's admissions of the commissions of crimes other than that for which he was being tried, as tending to establish his guilt of the offense charged against him in the indictment in this case. If the other homicides, in which the defendant admits he participated, were a part of the scheme under which the one for which he was tried was committed, why should the jury not consider the former in determining the guilt of the accused? If the same motive existed for the commission of all these crimes, why should not the jury consider such motive as tending to establish the guilt of the defendant in this case? Such motive might turn the scale against him. If these other offenses tended to show a scheme or plan under which the offense for which the defendant was being tried was done,

why should not the jury consider this evidence in determining the guilt of the defendant? It seems to us that the jury should especially consider this evidence in determining the truth of the defense set up by the defendant that he committed all these homicides under coercion. If the jury should find that there was a scheme formed under which both of these defendants committed these homicides, then such scheme would tend to disprove this defense. We do not think that the objection to these charges, that they are misleading, is well taken. We do not see how the jury could have been misled by them.

The next objection to these charges is that they did not limit the use of such evidence to the establishment of a general plan, scheme, or motive, but permitted the jury to consider the evidence referred to as tending to prove the defendant's guilt of the crime for which he was being tried. The court distinctly charged the jury that the evidence of the commission of other homicides by the defendant was submitted to them, not for the purpose of showing that he was guilty of these other crimes, but solely for the purpose of showing whether or not a motive or scheme existed on the part of the defendant, and in that way connect the defendant with the commission of the crime alleged in the indictment. The court further instructed the jury that it was for that purpose only that he permitted this evidence to go before them. He further instructed the jury that whether such evidence showed a motive or scheme on the part of the defendant or not, or whether such evidence tended in any way to connect the defendant with the offense charged in the indictment, were exclusively questions for their determination. If any part of these instructions is objectionable, it is that which left to the jury the determination of the question whether or not the evidence of these other homicides connected the defendant with the commission of the crime for which he was being tried. As the defendant admitted in his previous statement, and in his testimony on the trial of Williams, that he participated in the homicide for which he was being tried, clearly these instructions were harmless, even if erroneous.

In this case proof of the intent with which the defendant acted in the commission of the crime for which he was being tried was of prime importance. Where the crime charged is part of a plan, or within the scheme, of criminal action, evidence of other crimes

near to it in time and of a similar character is relevant and admissible to show the intent of the accused, and that the act charged was not the result of coercion.

For none of the reasons assigned do we think that the court erred in giving the instructions complained of in these grounds.

4. As the case goes back for a new trial, we express no opinion upon the evidence.

*Judgment reversed. All the Justices concur, except*

GILBERT, J., dissenting. The writer dissents from the ruling made in the second headnote and the second division of the opinion, and from the judgment of reversal. The case is reversed alone because the court refused to instruct the jury in accordance with the request quoted in the above-stated headnote and division of the opinion. As also shown in the opinion, the court did instruct the jury fully, fairly, and concretely the law applicable to one who commits a homicide under threats, menaces, and coercion, as provided in the Penal Code (1910), § 41. Under this concrete instruction to the jury it was the duty of the jury to acquit the accused if they believed that he committed the offense because of threats, menaces, and coercion, and that the coercion was of such nature as to create in the mind of the defendant a reasonable fear that his life or member was in danger. This concrete charge gave the defendant the full benefit of his defense and the only defense he interposed. The court did not charge that malice would be implied merely from evidence that the homicide was committed, and consequently the failure to charge the converse could not, in the opinion of the writer, be injurious, when considered in connection with the charge on the subject of duress as above stated.