The circumstantial evidence in this case was sufficient to authorize the jury to reject that part of the defendant's statement tending to show that he committed the homicide under circumstances of justification or mitigation, and the jury was authorized to find the defendant guilty of murder. No error is shown in the special grounds of the motion for new trial.
 No. 15969. OCTOBER 23, 1947.
Victor Smith was indicted for the murder of Roy Oliver Downer. He was convicted with a recommendation of mercy. His motion for new trial, as amended, was denied by the trial court, and the exception is to such denial.
The evidence for the State showed: Mr. and Mrs. O'Hern lived on McGarrah Street in the City of Americus on February 27, 1947, the date of the homicide. They were awakened in the early morning on such date by the barking of their dog. Mrs. O'Hern testified that: "After I woke I heard voices on the outside, heard someone talking; I could not say how many were talking; I could not say there was more than one voice; they were talking low; from hearing them talk I could not distinguish anything that was said; the voice I heard was not distinct enough to where I could form any impression as to whether it was a fussy noise or distressful noise; I did not at any time notice a rise or lowering in that voice; the voice I heard was approximately the same volume and sound all the time; that voice seemed to be in the same place all the time; . . after I heard them talking there in the same tone the next thing I heard I thought something hit the porch; it sounded like a folded paper; . . I did not hear anything else after I heard that until I heard the shot; it was just a few seconds from the time I heard something that sounded like hit the porch . . before I heard that shot, a second or two; when I heard that shot it sounded like a gun shot; . . after I heard whatever it was shoot I did not hear any talking out there; after I heard the gun shoot one time in just a few seconds it shot three or more times; . . as soon as that gun fired three times a car left; . . I did not hear a car door slam." Mr. O'Hern testified in part: "It was cold that morning when I heard those shots fired; as soon as I got to the door I opened the door of my house and I saw an object out there; it was very dark; I could not tell what the object was when I saw it, it was so dark; I stepped back and got my flashlight and shined it out the door and noticed it was a human body out partially on the sidewalk and in the street; . . when I found it was a human body I asked her [Mrs. O'Hern] to call the police."
Deal Jordan, Captain of the Police Department of the City of Americus, testified that: Mrs. O'Hern called him to report the body in front of her home, and he and another policeman went to investigate it. He received the call between 4:30 and 4:45 o'clock *Page 853 
on the morning of February 27. He found the body of a man lying with part of his head on the sidewalk and his feet hanging off the curb. The deceased was Roy Oliver Downer. The witness further testified in part: "Sometime after that Victor Smith was brought down to the scene by somebody; two policemen brought him down, Mr. Lawhorn and Mr. Countryman; . . I heard Mr. Victor Smith at that time make some statement to somebody relative to how that man got killed; I asked him; I did not threaten him in any way, offered him no reward or inducement, and did not put him in the slightest fear of injury; he made that statement of his own volition voluntarily; when they come down there in the car I walked out to the car; . . and says, `What is the trouble, Vic?' and he says, "This boy was going to whip me,' and said, `We stopped,' and said he did not like it a damn bit, but he did not say what he did not like, and said he come on him with a bottle of beer, said Vic hit Downer side of his head with the pistol, and that did not stop him and he shot him, said he chunked a bottle of beer at him and hit the side of his car; he said he was going to whip him there, said he stopped there, was going to whip him there; he did not tell me where he was going or intended to do; . . nobody said anything to me about taking anybody home; he said Downer was going to whip him anyhow, and said he slapped him side the head with his pistol, and that did not stop him and he shot him; . . when they drove down in the car I walked out to the other car where he was at and says, `What is the trouble, Vic?' and he says, `This boy, we stopped out here, and he said he was going to whip me,' said he did not like it a damn bit, and said, `I slapped him side the head with my pistol and that did not stop him,' and said, `He chunked a bottle at me and I shot him;' that is the way he said it; he said he chunked the bottle at him; he said he shot him after he said he chunked the bottle at him; . . he said that bottle hit the side of the car. Acting upon what Mr. Smith told me, I made an examination of Victor Smith's automobile that day; I did not see any dents or bruises on that car at all; he told me he hit the side of the car with the bottle; I found nothing on that car at all to indicate it had been struck; I smelled no beer on that car; . . he did not tell me whether the bottle was full of beer or an empty beer bottle; . . Victor Smith was drinking that morning when I saw him and *Page 854 
heard him talk; he was not to say down drunk, but he was pretty full of whisky; . . he did not say he was coming on him with the bottle before he chunked it, just said he chunked the bottle at him; he did not say where he was."
Officer L. A. Lawhorn testified: On the morning of the homicide he received a call to go to where Victor Smith lived, that Smith had just shot a man. When he arrived there, Victor Smith was there, fully dressed, and he and Officer Countryman took Smith in custody. Countryman asked Smith what was wrong, and Smith said that he just shot a man. Lawhorn asked him why he shot him, and Smith said that the man was going to whip him. He testified further in part as follows: "Mr. Victor Smith stated that he was coming down McGarrah Street in his automobile; Mr. Downer was with him; he said, when they were coming down McGarrah Street Victor Smith told the man in the car with him he was going by and tell his wife where he was going; he did not use the name Downer; he started on by and Mr. Downer says, `No, you are not going,' and he says, `Yes, I am,' and he says, `No, . . you ain't,' and he made him stop the car, and the other man got out of the car and come around the back of the car with a bottle in his hand; he said the other man struck at Mr. Smith with the bottle; Mr. Smith said he was on the ground then; they had both got out of the car; he said he shot one time straight up thinking maybe that would scare him and stop him, and said Mr. Downer hauled off and threw the bottle then, and he said he shot at his body; he did not say exactly what the bottle hit when he threw the bottle; he did not claim it hit him and then he shot him; when I had him in custody he was pretty full; he had just all he could tote; at the time he came out there to the car to get in he was wobbling; that was when we put him in the car to take him down to the scene; we asked him down there who the dead man was; he said he did not know who the boy was, never had seen him before."
Sheriff Jack McArthur testified: He investigated the homicide at approximately 5 o'clock a. m. "The weather was cold: . . I saw no one in his shirt sleeves but Mr. Downer, the dead man; he had on a grayish-blue suit of clothes without the coat, had on his pants and vest and shirt sleeves with his sleeves rolled up about two rolls; . . Roy Oliver Downer was dead when I got there; *Page 855 
I saw some blood on Roy Oliver Downer's left ear, congealed blood, and also saw a bullet hole right along there in the left back of his clothes." Several days after the burial of the deceased, the body was removed and an autopsy was performed, which he attended. On the morning of the homicide, after the witness put Smith in jail, he went out to the place operated by Smith, known as "Vic's Place." An automobile was parked at that place, which was later identified as the automobile of Roy Oliver Downer. He found a coat at Vic's place of the same color and texture as the pants and vest on the deceased. He found a woman's blouse there that had what appeared to be blood on it. He testified in regard to Smith's pistol and the wounds of the deceased in part as follows: "I got the pistol that Victor Smith had on that occasion that Roy Oliver Downer was shot with; it was a thirty-eight long Smith and Wesson; . . from having seen the wound out there on the body of Roy Oliver Downer on McGarrah Street and from having seen those wounds I narrated at the autopsy and the experience I have had with pistols and firearms, I formed an opinion as to the cause of Roy Oliver Downer's death; I thought he was killed from that pistol from that wound, in my opinion, that went in the left shoulder; from my experience that I have had with handling firearms and the wound in the back of that man's left shoulder, Roy Oliver Downer was shot from above; he had to be shot from above where he was; he was shot from the back side; . . Roy Oliver Downer could not have been shot from the front; . . both those pistol wounds that I saw were made from the back side; for the man to be shot with the entrance wound being lower than the exit wound, he would have to be lower than the man that was shooting him; he would either have to be down or lower than the man that was shooting him; if Roy Oliver Downer had been standing up and the man who shot him was standing up, that bullet could not have ranged up; . . at the time I saw that pistol there were four empty cartridges in it." He testified in regard to a beer bottle found at the scene of the homicide: "I saw a broken beer bottle there on the road at the place Mr. Downer was found; it was a twelve-ounce Cook's beer bottle. I have that beer bottle; that is the beer bottle that was on the street out on McGarrah Street the morning I went out where Mr. Downer's body was; that is practically all the bottle excepting the neck except that broke out down *Page 856 
there on the side; there was beer in that bottle when I went to wrap it up; I poured it out; two or three days ago I took a Cook's beer bottle, brown like that one, and held it up in my hands and dropped it on the pavement out there; it broke all to pieces, a thousand pieces; . . I never did find the neck of the bottle."
Dr. L. S. Boyette, physician and surgeon, testified: He examined the body of Roy Oliver Downer superficially prior to burial. He found a bullet wound through the back of the left arm, a bruise over the right cheek, a bruise on the left ear, and a bruise on the skull. The witness attended an autopsy performed by Dr. Herman Jones, and considered the autopsy a very competent one. From the test made at the autopsy it appeared that the wound on the shoulder of the deceased was made before death, because blood was found in the tissues, and after death there is no circulation of blood. An incision was made which showed a severe wound of the scalp, which would have been sufficient to daze a person. This wound was made before death. A wound was found, which looked like a bullet wound, in the back side of the left arm or shoulder. The bullet entered the back of the left arm, went through the left lung, and then went through the ascending aorta, which would have killed him almost immediately. The bullet wound in the thigh showed no bleeding, and apparently was made after death.
Dr. H. R. Fenn testified that he examined the body of Roy Oliver Downer, and attended the autopsy. A part of his testimony is substantially the same as that of Dr. Boyette. He testified that the entrance would in the back thigh was lower than the exit wound, and no bleeding was noticeable.
The defendant made a statement, the material part of which is as follows: "On the night Mr. Downer was shot, he came out to my place around midnight and drank some beer and danced some. I did not pay any particular attention to him or to what was said or done until he and Mildred, the girl who ran the kitchen and cafe, got into an argument. He had her down, and Mildred hit him with a bottle and they got into a tussle and fell against the counter. When I got right to where they were, he had her penned in the corner at the counter. I pulled him off of her, made her leave my place. Mr. Downer was bleeding some from the lick Mildred hit him, which was somewhere about the head; I told him to get a *Page 857 
towel out of the cabinet and clean his face; he reached in the cabinet and I thought he got a towel, but it was some kind of waist. After he had cleaned his face, he and I sat there and had several more beers and talked just in a general sort of way until about four o'clock; when I started to close he got another bottle of beer, and we went out and I locked up the place; he carried the bottle of beer out with him and after I locked up he came on to my car and said, `How about carrying me to town so that I can get a taxi to carry me home?' He says, `I am too drunk to drive and the police have already got me twice before and I am afraid they will get me again;' I told him, `All right;' when he started off he began cursing Mildred and I told him he was in the wrong, that Mildred had not done any more than anyone else would have done; I told him she ought to have hit him; he then went to cursing me and said, `Damn it, you are taking up for the damn woman, and I will beat hell out of you;' just before we stopped I saw he was going to hit me and possibly make me wreck the car; I stopped the car and he got out and came around the back of the car; as I got out I noticed he still had the beer bottle in his hand; I grabbed my pistol and hit him with it, but he kept coming and I backed off across the street and he came on towards me with the beer bottle in his hand; I shot at first just to frighten him and thought maybe he would stop, but instead of stopping he kept coming on me and turned kind of sideways with one arm back and the other kind of raised, and just before I backed up on the sidewalk I fired again and he kept coming on me; after I had backed up and across the pavement of the sidewalk I fired again and he fell; when I saw he was lying still on the ground, I went back to my car, got it and drove around to my house not very far away; when I first got to the house I drank some whisky which was already there; I was terribly upset and the first thing I did was take the whisky and call the officers; I called the police station and told them who I was, that I just had to shoot a man; I had absolutely no reason for wanting to hurt Mr. Downer, as I barely knew him and had never had any trouble or argument with him; he had been out to my place just a few times before this night, and I had nothing in the world against him and would not have harmed him for anything in the world if he had not made me do it, but when he kept on coming in a crouch and acting like he was, I knew *Page 858 
I had to shoot him in self-defense, because I knew if he ever got to me with that bottle he would have beaten me and cut me to death with it; everything I did he made me do it, and I am terribly sorry but I had to do it; gentlemen, there is one more thing I would like to say, the officers in this case misunderstood my statement I made to them that night."
The defendant offered no testimony. After his statement the State introduced several witnesses.
E. F. Johnson testified that he was a milkman on the date of the homicide, and was out on McGarrah Street about 4:30 o'clock a. m. He heard no pistol shots. He saw Smith's car parked about fifty feet from the O'Hern house, and Smith was standing with one foot on the pavement and one upon the running board. The distance from where the automobile was to the place where the body of Roy Oliver Downer was found was 140 feet.
Dr. Herman Jones, Director of the Fulton County Scientific Crime Laboratory, testified in regard to the autopsy performed on the body of Roy Oliver Downer, and the blood stains found on articles of clothing. He testified: The blood found on the clothing of the deceased was type "A." The blood on the blouse introduced in evidence would not agglutinate, which would mean either that it was type "AB" blood or that the property of the blood to agglutinate had been lost through age, and the blood found on the blouse was either not the same type as that on the clothing of the deceased, or the blood on the blouse was older than that on the clothing of the deceased. The wound received by the deceased on the left back of his head was somewhat circular in nature. The wounds which he had observed, caused by a bottle, were oblong. The wound was more of the character that would be caused by a pistol than a bottle. The wound over the right shoulder had to be inflicted from the back, or else the man had to be down at a lower level than a normal upright position.
Miss Clyde Gruber testified that she had a date with Roy Oliver Downer on the night before he was killed. She was with him until about 12:15 o'clock that morning. During the time he was with her, from about 7:30 until 12:15 o'clock, Downer did not take any alcoholic beverages.
A number of photographs and physical evidence identified by the State's witnesses were introduced in evidence. *Page 859 
1. While all of the admissions of the defendant in this case were coupled with explanations of the killing which might be sufficient, if believed, to justify the defendant, or to reduce the crime to voluntary manslaughter, the State introduced circumstantial evidence which disproved the theory that the defendant shot the deceased while he was coming toward him with a beer bottle. All of the wounds were in the back of the deceased, and one of the bullet wounds was made after death, according to the testimony of the physicians attending the autopsy. Such evidence would refute the defendant's statement that the deceased was attacking him at the time he shot. The statement of the defendant that an employee in his place of business hit the deceased over the head with a beer bottle, and the deceased wiped his head on a blouse found at the defendant's place of business, was contradicted by the testimony of Dr. Jones that the blood spots on the blouse and those on the clothing of the deceased could not have been the same type and made at approximately the same time, because the blood on the blouse could not be typed, while that on the clothing of the deceased was type "A." Other statements of the defendant were contradicted by the evidence for the State.
The jury in passing upon an incriminating admission may believe a portion of it and reject the balance as false. Cook
v. State, 114 Ga. 525 (40 S.E. 703). The circumstantial evidence in this case was sufficient to authorize the jury to reject the defendant's contention that the killing was in self-defense, and the verdict of the jury finding the defendant guilty of murder was supported by the evidence.
2. Special ground 1 assigns error because the court refused the following written request to charge: "Murder is the unlawful killing of a human being, in the peace of the State, by a person of sound memory and discretion, with malice aforethought, either expressed or implied. You will observe from the definition, I have just given you, of murder, that, in order for the killing to amount to murder, the slayer must have been activated by malice, either expressed or implied." It is insisted that the charge was peculiarly *Page 860 
applicable and pertinent to the facts of the case because the defendant in his statement denied having any reason for wanting to harm the deceased; that there was no direct evidence as to who killed the deceased aside from the statement of the accused; and that the refusal to charge was prejudicial and harmful to the defendant because he was thereby deprived of the legal right, to wit, "of the burden of proof being upon the State to show beyond a reasonable doubt that defendant was activated by malice in slaying deceased."
The court in its charge gave the definition of murder, and express and implied malice, as set out in the Code. Subsequently, in charging on the presumption that might arise from the use of a deadly weapon, the court stated: "If the accused admits the killing with a deadly weapon, but adds an explanation which might negative malice, no presumption that the homicide was perpetrated with malice would arise under such admission, but it would be incumbent upon the State to prove malice before you would be authorized to convict the defendant of murder; that is, if you believe he admits killing him with an explanation that tends to negative malice, . . then there is no presumption of malice that would arise, but it would be up to the State then to prove malice to your satisfaction beyond a reasonable doubt."
The charge of the court sufficiently instructed the jury on the necessity for the State to show malice before the defendant could be convicted, and a refusal to charge in the exact language of the request does not require a reversal. Slocumb v. State,157 Ga. 133 (8) (121 S.E. 116).
3. Grounds 2, 3, and 4 complain that the court erred in refusing to give certain written requests to charge, which are on the same subject and may be considered together. The requested instruction set out in ground 2 is as follows: "I charge you that murder does not consist merely in the killing of a human being; the killing must be done with malice. When the fact of the killing is shown, and the evidence adduced to establish the killing shows neither circumstances of justification nor alleviation, malice may be inferred. Likewise, if the statement of the defendant admits the homicide without explanation, malice may be inferred from such admission. But if at the time of the admission the homicide is justified, such qualification of the admission of the homicide robs it of the vital element of murder, and the burden would still be on the State to show that the killing was done with malice." *Page 861 
Ground 3 sets out the following requested instruction: "I charge you that, if the accused admits the killing with a deadly weapon, but adds an explanation which might negative malice, no presumption that the homicide was murder would arise from such admission."
The requested instruction in ground 4 is: "Where the evidence relied upon by the State to establish the fact of the homicide discloses circumstances of mitigation or justification, such evidence does not raise a presumption of malice, and the burden would still rest upon the State to prove malice, on the part of the slayer, beyond a reasonable doubt."
Counsel for the defendant cite Manning v. State, 153 Ga. 196
(111 S.E. 658), as being a case where the failure to charge the identical request set out in ground 2 was held to be error. In the Manning case the defendant was not given the benefit of the principle of law requested by any charge of the court. In the present case the court charged as follows: "Now I charge you, gentlemen of the jury, that ordinarily, if one kill another with a deadly weapon without justification or mitigating circumstances, the jury would have the right to presume malice, but I charge you, gentlemen of the jury, that, if the accused admits the killing with a deadly weapon, but adds an explanation which might negative malice, no presumption that the homicide was perpetrated with malice would arise under such admission, but it would be incumbent upon the State to prove malice before you would be authorized to convict the defendant of murder; that is, if you believe he admits killing him with an explanation that tends to negative malice, as I said, then there is no presumption of malice that would arise, but it would be up to the State then to prove malice to your satisfaction beyond a reasonable doubt."
The charge of the court gave the defendant full benefit of the principles of law set out in his requests to charge quoted in grounds 2, 3, and 4, and he could not have been harmed by a failure to charge in the exact language of the requests.
4. Ground 5 contends that the court erred in refusing to give in charge a written request which contained almost the exact definition of manslaughter as found in the Code, § 26-1006 (with the exception of that portion in regard to involuntary manslaughter), and practically the definition of voluntary manslaughter as found *Page 862 
in the Code, § 26-1007. It is insisted that such request was not covered, or substantially covered, by the general charge, that certain quoted evidence demanded it, and that the charge given on manslaughter was commingled with the law of murder.
The court charged the Code, § 26-1007, but did not charge § 26-1006. A study of the complete charge as contained in the record does not confirm the contention that the law of manslaughter was commingled with the law of murder. Section 26-1007 is an enlargement on the definition of voluntary manslaughter as given in § 26-1006, and the defendant does not show that he was harmed by the failure to charge § 26-1006.
5. Ground 6 assigns error because the court refused to charge the following request: "I charge you that justifiable homicide is the killing of a human being in self-defense, or in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony on either. I charge you further, in this connection, that if you believe from the evidence or the defendant's statement that the defendant unlawfully killed the deceased to prevent a misdemeanor upon his person, or to prevent a trespass upon his person less than a felony, the defendant would be guilty of voluntary manslaughter, unless you believe him justified, under the law as given you in charge or may be hereafter given in charge, and if you believe him justified or if you have a reasonable doubt as to that, it would be your duty to give him the benefit of the doubt and acquit him of any offense."
The first sentence of this request was given in charge by the court. The last sentence commingles and confuses the law of voluntary manslaughter and justifiable homicide, and is not a proper request. Brown v. State, 195 Ga. 430 (2) (24 S.E.2d 312).
6. Ground 7 assigns error on the refusal to give a lengthy requested charge. This request was partly inapt and inaccurate, parts of it were repetitious, and the court plainly did not err in refusing to give the charge as requested.
7. Ground 8 complains that the court erred in refusing to charge a request on circumstantial evidence. This was given in charge by the court practically verbatim, and was not commingled with any other law on the subject.
8. Ground 9 assigns error on the court's refusal to charge the following request: "The court further charges you that, where *Page 863 
the facts in evidence and all reasonable deductions therefrom present two theories, one of guilt and the other consistent with innocence, the justice and humanity of the law compel the acceptance of the theory which is consistent with innocence. Guilt of a criminal offense must be proved beyond a reasonable doubt, and the jury can not convict upon mere conjecture or bare suspicion." It is contended that this instruction was pertinent to the facts of the case and would have aided the jury in its determination of the issues, because the State's case was predicated mainly on circumstantial evidence and suspicions of guilt. The request to charge is in the language of the headnotes in Davis v. State, 13 Ga. App. 143 (78 S.E. 866).
In the Davis case the testimony of the only witness introduced by the State presented facts which were consistent with either guilt or innocence. In the present case the State introduced uncontradicted evidence that an autopsy on the deceased showed that the bullet wounds were received in the back of his body. Other testimony given in regard to the autopsy was inconsistent with the theory of the homicide given by the defendant on the trial, that the deceased was coming on him with a beer bottle and he killed him in self-defense. It has been repeatedly pointed out by this court that the fact that certain language is contained in an opinion of an appellate court does not necessarily make it applicable to be given in charge on the trial of a case. In Lewis v. State, 196 Ga. 760 (27 S.E.2d 659), a charge very similar to the one requested in the present case was refused, and this court held in that case: "The words, `the jury can not convict upon mere conjecture and bare suspicion,' were not adjusted to the evidence in the case. So to charge would have unjustifiably reflected upon the State's evidence, and the request was more favorable to the accused than the evidence authorized." In the present case a part of the language requested was not adjusted to the evidence, and the court did not err in refusing the charge.
9. Ground 10 asserts that the court erred in refusing to give the following request to charge: "I charge you further that suspicion alone, however well founded, has no probative value as evidence, and if from all the facts and circumstances there is raised in your minds only suspicion of guilt, it would be your duty to acquit the defendant." It is contended that this charge was pertinent, *Page 864 
because the State's case was based mainly on circumstantial evidence, and because there were a number of suspicious circumstances, of no evidentiary value, which the jury possibly considered.
In Lewis v. State, supra (page 762), a similar request to charge was held not to be based on the evidence, and to constitute an unwarranted reflection upon the evidence offered by the State in that case. The same ruling would apply in the present case. The trial court properly charged the rules to be applied in testing the evidence to determine if it authorized a conviction, and it was not error to refuse this requested charge.
10. Ground 11 contends that the court erred in giving the following instruction to the jury: "You will determine that issue from the evidence introduced upon the trial, including the oral testimony of the witnesses upon the stand, and any photographs or pictures of any kind or article of any kind or thing of any kind that may have been admitted in evidence for your consideration." The vice alleged in the charge was the phrase, "and any photographs or pictures," the defendant claiming that the instruction was an expression of opinion by the court as to the weight to give such evidence, and that the undue prominence given to such class of evidence was misleading, confusing, harmful, and prejudicial to the defendant.
This excerpt from the charge does not indicate what issue was to be determined from the classes of evidence named, and it requires a study of the entire evidence to understand why any emphasis on the photographs introduced in evidence might have been harmful to the defendant. The contention that the instruction was an expression of opinion by the court as to the weight to be given to the evidence in regard to photographs and pictures is without merit. A consideration of the charge of the court contained in the record shows that, in the same sentence in which the excerpt complained of appears, the court also charged: "And you will give in your consideration, in determining that issue, such weight and credit to the statement of the defendant as you think it entitled to receive after having heard it made." It thus appears that in this sentence of the charge the court was enumerating all the classes of evidence which had been introduced before the jury, and which it was their duty to consider, and no undue emphasis was given to the testimony concerning photographs.
11. The contention in ground 12 is that the court erred in *Page 865 
giving the following instruction to the jury: "Justifiable homicide is the killing of a human being in self-defense or in defense of habitation, property, or person, against one who manifestly intends or endeavors by violence or surprise to commit a felony on either. There is another principle of justifiable homicide; there is another section here that provides that all other instances which stand upon the same footing of reason and justice as those just read to you shall be justifiable homicide. There is another principle of justifiable homicide to which the court will call your attention, and that is one acting under reasonable fears. The law provides that a bare fear of any of those offenses to prevent which the homicide is alleged to have been committed shall not be sufficient to justify the killing. It must appear that the circumstances were sufficient to excite the fears of a reasonable man, and that the party killing really acted under the influence of those fears and not in a spirit of revenge." This instruction is claimed as erroneous because: It placed a greater burden upon the defendant than the law required, and misled the jury into believing that it was necessary for the defendant to be in defense of habitation in order for the right of self-defense to be available to him; it confused the defense of self-defense against one trying to commit a felony on the defendant, and the defense of habitation; it confused the law of self-defense against one who manifestly intends to commit a felony on another, and the law of self-defense of one acting under the fears of a reasonable man, which nullified both defenses; and it was misleading, confusing, harmful, and prejudicial to the defendant.
The defendant in a request to charge (as shown by ground 6 of the amended motion for new trial) requested the court to charge the identical language appearing in the first sentence of the excerpt contained in this ground. Therefore, the objections raised to this first sentence need not be considered, since the defendant can not complain of a charge which he has requested.
The contention that this instruction confused the law of self-defense against one manifestly intending or endeavoring to commit a felony on another, and the law of self-defense of one acting on the fears of a reasonable man, is without merit. The instructions are separated by the clause, "There is another principle of justifiable homicide to which the court will call your attention," which should have prevented the jury from confusing the two principles. *Page 866 
However, it would not have been erroneous even if the court had charged the principles of the Code, § 26-1012, immediately following § 26-1011. Marcus v. State, 149 Ga. 209 (2) (99 S.E. 614): Bryant v. State, 157 Ga. 195 (3) (121 S.E. 574).
Counsel for the defendant cite Franklin v. State,146 Ga. 40 (90 S.E. 480), White v. State, 147 Ga. 377 (5) (94 S.E. 222), and Little v. State, 164 Ga. 509 (5) (139 S.E. 37), in support of the contentions made in this ground. In each of those cases the court charged § 26-1014 in immediate connection with §§ 26-1011 and 26-1012. Since § 26-1014 applies only in cases of mutual combat, and contains a harsher rule of self-defense, the charging of this section without instructions as to when it would apply might tend to nullify the instructions in §§ 26-1011 and 26-1012. In the present case the court did not charge § 26-1014, and the cases cited by counsel for the defendant are not applicable here.
12. In grounds 13 through 29 it is contended that certain material evidence was illegally admitted by the court to the jury, over objection by the defendant, being photographs identified as exhibits "D", "E", "F", "G", "H", "I", "J", "K", "L", "M", "N", "O", "P", "Q", "R", "S", "T". In none of the grounds is any attempt made to state what the photograph shows, and it is necessary to refer to the record to make these grounds intelligible. See Collins v. State, 153 Ga. 96
(111 S.E. 733).
Photographs, diagrams, maps, plans, and similar items are generally admissible, when relevant, to describe a person, place, or thing, for the purpose of explaining and applying the evidence and assisting the court and jury in understanding the case. Fulton v. Chouteau County Farmers Co., 98 Mont. 48 (37 P.2d 1025), and cases cited. The objections made to the admission of the photographs in the present case were that they were "irrelevant, immaterial, and highly prejudicial." The objections to the admission of the photographs referred to in grounds 13 through 15 do not amount to more than this. In each ground it is stated that "the inadmissibility of the evidence was beyond doubt," but no attempt is made to describe or show the contents of the photographs in order that it might be determined whether they were irrelevant, and whether they were prejudicial and hurtful to the defendant. These grounds show no cause for reversal. Clare v. Drexler, 152 Ga. 420 (8) (110 S.E. 176). *Page 867 
13. Ground 30 complains of the court's refusal to allow the State's witness, Clyde Gruber, to answer the question propounded to her by the defendant's counsel on cross-examination as follows, "Did you ever know him [the deceased] to drink whisky?" The expected answer from the witness was "that this witness knew that at times Downer did drink intoxicating whisky and beer." The witness had stated on direct examination that she was with the deceased until about 12:15 o'clock on the morning of the homicide, and that he did not take any alcoholic beverages while he was with her. It is claimed that the evidence excluded would have been a circumstance to corroborate the defendant on the point that the deceased was drinking the night that he was killed, and would have corroborated the defendant's statement.
It was not erroneous to exclude this testimony of the witness. Even if her answer had been as anticipated by counsel, the fact that at times the deceased did drink intoxicating beverages would not substantiate the defendant's statement that the deceased was intoxicated on the particular occasion when the homicide occurred. That such testimony would be a circumstance to show that the deceased might have been drinking as claimed by the defendant, is too remote to make it relevant. Compare Perdue v.State, 135 Ga. 279 (11) (69 S.E. 184).
14. Ground 31 assigns error on the refusal of the court to charge the following request: "Where the defendant is connected with the homicide by his statements alone, the jury must accept his entire statement if it shows justification, alleviation, mitigation, or excuse." It is contended that there was no direct evidence as to who killed the deceased except the statement of the defendant that he did it, and that his admission was coupled with a statement that would show circumstances of justification, mitigation, or alleviation, and the court should have charged the language requested.
The charge requested was not adjusted to the evidence in the present case. Statements by the defendant to two officers were admitted in evidence, which statements varied in the account given of the homicide, and the defendant in his statement on the trial of the case gave a different version of the homicide. If the court had charged the language requested, the jury would not have known which statement of the defendant to accept, and the charge would have tended to confuse them. *Page 868 
The instruction was not adjusted to the evidence for the further reason that there was evidence from which the jury might have connected the defendant with the homicide besides the statements of the defendant, and a considerable amount of evidence in regard to the wounds on the body of the deceased that would contradict the portion of the defendant's statements which attempted to show that the deceased was attacking him. Under such evidence the jury was authorized to accept the admission of the defendant that he killed the deceased, and to reject the statements in the admissions which would tend to justify or mitigate the killing. Cook v. State, supra. It was not erroneous to refuse to give the requested charge.
15. Ground 32 contends that the court erred in failing to give in charge to the jury the law of voluntary manslaughter as related to the doctrine of mutual combat. Neither the evidence for the State nor the statement of the defendant showed any mutual combat between the defendant and the deceased. In his statement the defendant claimed that he killed the deceased in self-defense. The evidence for the State tended to contradict this view of the homicide by testimony showing that the wounds of the deceased were all received in the back. The court did not err in failing to charge the law of mutual combat.
Judgment affirmed. All the Justices concur, except Wyatt, J.,who took no part in the consideration or decision of this case.